**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Criminal Action |
| | ) No. 08-03109-01/03-CR-S-ODS |
| CLAUDE X, CHRISTINA X, and | ) |
| AARIKA TRACY, | ) |
| | ) |
| Defendant. | ) |

## REPORT, RECOMMENDATION, AND ORDER OF UNITED STATES MAGISTRATE JUDGE

Defendants have filed a Motion to Suppress Evidence, in which they assert that all evidence seized in connection with the search of a safe deposit box should be suppressed. [Documents # 70, 71, and 82]. Defendant Tracy moves, additionally, to suppress the evidence seized from her apartment. [Doc. # 71]. She has also filed a Motion to Disclose Identities of Confidential Sources. [Doc. # 72] The United States filed its responses. [Docs. # 73 and 76]. Thereafter, defendant Christina X filed a reply to the government's response. [Doc. # 78]. The matter was set for an evidentiary hearing, which was held before the undersigned on September 21, 2009. Defendant Claude X was present with counsel, Robert D. Lewis; defendant Aarika Tracy was present with counsel, Rose Barber; and defendant Christina X was present with counsel, Alison Hershewe. The United States was represented by Timothy Garrison, Assistant United States Attorney ["AUSA"].

1

**Safe Deposit Box**.

The government announced to the Court at the suppression hearing that it would present no witnesses regarding defendants' Motion to Suppress evidence found as a result of the search of the safe deposit box, but would rely on the application for the search warrant and the search warrant. Defendants, in their motions to suppress evidence seized from the safe deposit box, have argued that the witnesses/informants who provided information that was used in the affidavit and application have not been disclosed and that their reliability has not been established. The government contends that these individuals have been proven reliable in the past, and that their reliability has been corroborated by independent police investigation. It is asserted that the individuals provided information that the three defendants were involved in narcotics trafficking, which was corroborated by different agencies over several years, including the Springfield Police Department, the Drug Enforcement Administration, and other law enforcement agencies. This investigation resulted in the seizure of narcotics and controlled purchases from defendant Claude X and/or Aarika Tracy. It also led to an investigation of accounts held by all three defendants at Great Southern Bank in Springfield, including savings accounts opened by defendants Claude X and Christina X, which were funded with deposits of cash, and several Certificates of Deposit, also funded by cash. The investigation also revealed two safe deposit boxes that were jointly leased by Claude and Christina X, and one jointly leased by all three defendants, which had been accessed at an unusually frequent rate during the period of the investigation. This included the time before and after defendant Claude X was observed going into a Great Southern Bank branch and accessing one of the safe deposit boxes, going to the Battlefield Mall where he made surreptitious contact with a number of individuals, and

2

returning to the Great Southern Bank branch. Accordingly, the government assert that probable cause exists and that the warrant to search the two safe deposit boxes in this case was justified.

Defendant Tracy argues that just because the government might be able to establish that there has been drug activity, that does not link that activity to the two safe deposit boxes. Further, it is contended that if even if there is probable cause for one safe deposit box, that does not mean that probable cause exists for the other. Defendant Tracy asserts, therefore, that the search warrant affidavit and the other material presented are lacking probable cause in this case, and that the evidence found in Safe Deposit Box #10000595 ["Box #595"] should be suppressed.

At the hearing, defendant Christina X argued that there were several errors in the search warrant, albeit minor, that were not addressed in the briefs. These include the wrong day listed for when Box # 595 was leased (July 7 when it was, in fact, leased on July 27), and the fact that the warrant states that Claude X accessed Safe Deposit Box # 10000633 ["Box # 633"]on July 10th and opened a Certificate of Deposit on the same day, which is not corroborated by the bank documents provided. Additionally, it is contended that conclusory statements were made about defendant Christina X, which were not corroborated, and that the warrant never states that the informants were reliable.

In her reply suggestions, defendant Christina X reiterates that there is nothing set forth in the affidavit or discovery provided that connects either safe deposit box with drug activity; that there is not enough information on the face of the affidavit with which to assess the bases of knowledge of the unnamed sources; that the validity of the search of Box # 595 is not supported by probable cause because of a dearth of reliable facts; and that under the totality of the circumstances, there was not probable cause to believe that contraband would be found in Box # 595. Accordingly,

Case 6:08-cr-03109-MDH   Document 88   Filed 10/14/09   Page 3 of 21

defendant Christina X seeks suppression of the evidence taken from Box # 595.

Defendant Claude X asserts that there are glaring discrepancies in the affidavit. It is asserted that, for example, a traffic stop on July 15th for a vehicle driven by Claude X revealed no drugs, and statements about a K-9 were not enough to support a search warrant. Further, the affidavit contains no attempt to verify the information contained in various paragraphs, nor is there any information regarding the sources' reliability. Defendant Claude X submits that surveillance on him on May 13th, which involved following him to the bank, to the mall, and back to the bank, does not indicate that he was involved in any criminal activity. He contends that accessing Box # 633 on that day does not provide a nexus between criminal activity and that box, nor was there probable cause to search Box # 595. Therefore, defendant Claude X seeks suppression of the evidence that was found in Box # 595.

The Court has fully reviewed the arguments set forth in the motion to suppress, the affidavit in support of the search warrant, the response by the government, defendant Tracy's reply, and the positions of the parties enunciated at the suppression hearing. The affidavit prepared by Officer Timothy Krisik in support of the application for a search warrant for the safe deposit box in question, Box # 595, includes a plethora of information, from sources named and unnamed, regarding distribution of a variety of narcotics by Claude X, and involvement by defendants Christina X and Aarika Tracy, beginning at least in December of 2006. Further, the affidavit details various traffic stops and/or arrests of defendant Claude X where he was in the possession of cocaine, heroin, marijuana, and/or currency, as well as information regarding various drug transactions and drug involvement with defendant Claude X. It includes information from a source who stated that s/he had purchased drugs on numerous occasions from defendant Claude X and who provided details

4

about those drug buys, which also implicated defendant Christina X and defendant Tracy. The affidavit includes information regarding a search of a motel room where defendant Tracy was present and where marijuana, cocaine, and pills were found, as well as controlled buys with defendant Aarika Tracy, which were brokered by defendant Claude X, as evidenced by recorded conversations. Further, there is information regarding undercover drug purchases, wherein drugs and a handgun were purchased from defendant Tracy, which were brokered by defendant Claude X, as evidenced by a recorded conversation. There is additional information regarding drug purchases by a cooperating source, which were brokered by defendant Claude X, and were recorded. In total, the affidavit includes information that officers seized or purchased drugs at least eight different times from defendants Claude X and Tracy. The affidavit also contains information regarding surveillance, during the relevant time period, which involved observing defendant Claude X traveling to Great Southern Bank on May 13, 2008, spending twenty minutes there, then going into Battlefield Mall and visiting with several different employees, including one whom he briefly met in an "employee's only" area, and then traveling back to the bank for another 15 minutes. Additionally, the affidavit included records obtained from Great Southern Bank, which revealed that in addition to Safe Deposit Box #633 being leased by defendants Claude and Christina X, which was accessed an unusual number of times, the three defendants leased Safe Deposit Box # 595. That box, the subject of the motion to suppress, was opened on July 7, 2007, according to affidavit, although defendants maintain that it was not leased until July 27, 2007, according to discovery in the case. In any event, in a one month period, from July 30 to August 30, the bank records indicate that it was accessed 34 times by Christina X, and one time by both defendants X. The affidavit also indicated that Box # 633 was accessed 84 times by defendants Claude and Christina X between

December 27, 2008, and July 11, 2008. Additional information regarding bank activity by defendants Claude and Christina X include the opening of three Certificates of Deposit totaling $16,000 in cash, and deposits into other accounts in the total amount of $37,672.00. The affidavit also enumerates defendant Claude X's extensive criminal history, and states that there were no reported wages for defendants Claude and Christina X during the relevant time period. Officer Krisik stated in the affidavit that he believed there was probable cause to believe that defendant Claude X had been involved in the distribution of significant quantities of cocaine and heroin, and that both the safe deposit boxes contain proceeds from the distribution of these drugs, in violation of 21 U.S.C. § 841(a).

Defendants contend that the search warrant was issued without the requisite probable cause. The law is clear that a warrant is supported by probable cause if, "given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that contraband or evidence of a crime will be found in the place to be searched. United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995), quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). Affidavits should be read in a "common-sense and realistic fashion" and judges must make a practical decision based on the totality of the circumstances. United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) (citation omitted). In determining for suppression purposes the validity of a warrant, the court must determine whether there was a "substantial basis" for the probable cause determination. Gates, 462 U.S. at 238. Probable cause may be based on hearsay from a reliable source, and anonymous information that can be independently corroborated may form a probable cause basis. Id. at 244-45. "When we review the sufficiency of an affidavit supporting a search warrant, great deference is accorded the

6

issuing judicial officer." <u>U.S. v. Fulgham,</u> 143 F.3d 399, 400-01 (8th Cir. 1998) (citation omitted).

After fully reviewing the evidence, the Court finds that there is sufficient information in the affidavit to support a probable cause finding. In this case, the Court believes that based on the information set forth in the affidavit, the issuing judge could conclude that there was a substantial basis to support the search warrant. When considered in total and when read in a common sense fashion, which the law requires the Court to do, the information regarding surveillance, traffic stops, drug activity and arrests, controlled purchases, undercover purchases, confidential sources and other sources, bank records, work history, and criminal history leads to the conclusion that the affidavit contained sufficient and corroborated information to establish probable cause for issuance of the search warrant for Box #595. Although the affidavit does not specifically attest to the veracity or reliability of confidential or cooperating sources, when considered as a whole, the Court finds that the information provided by unnamed sources has been corroborated by the extensive investigation conducted by various law enforcement agencies over an extended period of time. The cumulative effect of the information provided, when corroborated by such investigative tools as undercover purchases of drugs, recorded phone conversations, and firsthand observation by law enforcement officers through surveillance, provides a substantial basis for a probable cause determination. The Court is mindful of defendants' arguments regarding minor inconsistencies in the affidavit. These inconsistencies are clearly not significant enough to hinder a probable cause finding. Additionally, they contend that even if there was a nexus between criminal activity and the safe deposit boxes, there is nothing to implicate Box # 595 individually. When reviewed in total, however, it is clear that there was extensive and repetitive narcotics activity by defendants Claude X and Aarika Tracy, coupled with the three defendants leasing Box #595 and the two Xs leasing Box # 633. Over the

Case 6:08-cr-03109-MDH   Document 88   Filed 10/14/09   Page 7 of 21

relevant time period, there was an unusual amount of activity in accessing the two safe deposit boxes by both Claude X and Christina X. Further, a substantial amount of cash was being deposited into various accounts with no apparent legitimate source. Taken as a whole, this evidence results in the conclusion that there was a substantial probability that either or both of the safe deposit boxes would contain evidence of criminal activity, and that evidence of a crime would be found in Box # 595. Even assuming, however, that the warrant in this case was not based on probable cause and found to be defective, the Court finds that the good faith exception enunciated in United States v. Leon, 468 U.S. 897, 922-23 (1984), would apply. It is clear that Officer Krisik relied in good faith on what he believed to be a valid search warrant, which was reviewed and signed by a neutral magistrate. There is nothing to suggest that the affidavit was so lacking in indicia of probable cause that the Leon good faith exception should not apply. Accordingly, it will be recommended that defendants' motion to suppress evidence seized from Safe Deposit Box #595 be denied.

**Disclosure of confidential informants**.

Defendant Tracy has filed a motion for the government to reveal the identity of the confidential informants, confidential sources, sources of information, and cooperating sources, who are alleged to have witnessed criminal behavior by her. She contends that discovery produced by the government contains numerous references to sources of information, confidential sources, and cooperating sources, and that these references are confusing. It is difficult, according to her, to tell if some of these sources are the same person or even a person who has otherwise been identified. She contends that the government must disclose the identity of informants who are material witnesses, and that this includes those who witnessed her alleged criminal actions. Defendant Tracy argued at the suppression hearing that failure to disclose the sources of the information hampers her

Case 6:08-cr-03109-MDH   Document 88   Filed 10/14/09   Page 8 of 21

ability to discern whether the sources are credible.

The government contends that, pursuant to this Court's Scheduling and Trial Order, [Doc. # 26], it will fulfill its obligations to disclose all required discovery in accordance with the Federal Rules of Criminal Procedure and the orders of the Court. The government argued at the suppression hearing that the sources relied, as set forth in the affidavit, have been proven reliable in the past, and that their reliability has been corroborated by independent police investigation involving several agencies over several years. It is asserted that the individuals provided information that the three defendants were involved in narcotics trafficking, and that the investigation resulted in the seizure of narcotics and controlled purchases from defendant Claude X and/or Aarika Tracy, as well as the investigation of accounts held by all three defendants at Great Southern Bank in Springfield.

The Scheduling Order entered in this case requires that the government must disclose the identity of confidential informants who are material witnesses no later than ten days prior to trial. The government has indicated that it will comply with discovery and pretrial notices according to the Federal Rules of Criminal Procedure. Additionally, the government represented at the suppression hearing that the informants have been proven reliable, based on the corroboration of information provided by them through a lengthy investigation involving various agencies. Based on the record as a whole, the Court finds that defendant has not met her burden of establishing beyond mere speculation that the informants' disclosure in advance of the deadlines set forth in the Federal Rules of Criminal Procedure and Scheduling Orders would be material to the case. Therefore, it will is ordered that the motion to disclose confidential informants be denied. E.g., United States v. Harrington, 951 F.2d 876, 877 (8th Cir. 1991); United States v. Kime, 99 F.3d 870, 879 (8th Cir. 1996).

**Search of defendant Tracy's apartment**.

On the issue of the search of defendant Tracy's apartment, the government first called Eric Zumdome, who presently works for the U.S. Marshal's Service. Prior to that, he was employed by the Springfield Police Department, and was a deputized Drug Task Force Officer with the Drug Enforcement Administration ["DEA"]. On October 9, 2008, he participated in the execution of a federal arrest warrant for Aarika Tracy. He and another Task Force Officer, Richard Mayo, obtained information that she was living at an apartment complex. They found her outside the apartment and arrested her. She asked to make a phone call after she was placed under arrest. Later, he found out that the call she made was to defendant Christina X. Officer Zumdome asked her whose apartment she was staying in, and she said it was Aleha Poe's apartment. He asked for consent to search the apartment, and she agreed. He doesn't recall how many times he asked her, but it was not a repeated question. He had no doubt that her consent was voluntary, and he did nothing to coerce her or place her under duress. He began searching the apartment, but did not recall if she was outside or inside the apartment at that time. While he was searching, Officer Mayo was with defendant Tracy. Officer Zumdome started his search in the kitchen where he found a Pringles can on top of the refrigerator. It appeared as if it were a sealed canister; inside, he found about $3000, packed with hair ties and inside plastic baggies. Also, on top of the refrigerator, he found a box of assorted mail, including a utility bill with Claude X's name on it, and some other mail with defendant Tracy's name. Additionally, he found a set of digital scales on top of the refrigerator. He called the DEA Office to speak to Special Agent Mark Hooten, requesting his assistance. Agent Hooten came to the scene, after which Ms. Tracy requested to make another phone call. She wanted to contact an attorney.

10

After the phone call, she revoked her consent to search. At that point, Officers Zumdome and Mayo took her to the Greene County Jail. Officer Zumdome informed Agent Hooten that she had revoked her consent after he had arrived on the scene. Agent Hooten stayed at the apartment to secure it while they got the search warrant. He typed up the affidavit and gave it to AUSA Timothy Garrison. The officers contacted a state court judge because a federal magistrate judge was not available. Judge Michael Cordonnier was the on-call judge. The judge responded to the AUSA's call, by coming to the office. Although this was atypical, it was after 5:00 p.m. and he was on his way home. The judge inquired about his authority to sign a federal search warrant. After seeing the applicable federal rule and reviewing the documents, the judge issued the search warrant. The officer testified that he then called Agent Hooten and told him the search warrant had been issued. As far as he knows, no search took place during the time after defendant Tracy revoked her consent until the search warrant was issued, and no evidence was found while they were waiting for the search warrant.

On cross examination, Officer Zumdome testified that he made a report regarding defendant Tracy's arrest, and on the recall of the fugitive warrant. Other than those and the application for the search warrant, he made no other reports. His report, dated October 10, 2008, the day after the events in question, was about the arrest of Ms. Tracy. The report indicates that she was arrested without incident on a federal warrant for conspiracy to distribute heroin, outside her apartment. He did not mention consent or searching her apartment in the report. He did not recall placing her inside his vehicle before they searched her apartment. He believed she was handcuffed, but not <u>Mirandized</u>. There was no interrogation, but he did ask who was living in the apartment and if he could search the apartment. He asked her about who was living there to

make sure she had the authority to consent. It was about 2:15 p.m when he arrived at the scene. He thinks it was no more than 30 minutes before he asked for consent to search. The reason this much time elapsed was because they allowed her to make a phone call for someone to come collect her keys to the apartment, and they were waiting for that person. He didn't know at the time who defendant Tracy called, but learned later from Agent Hooten that she had called defendant Christina. X. The officer was not sure exactly how they entered the apartment, but thought they followed her into it, in order for her to get her keys. The officer explained that defendant Tracy was standing right in front of her apartment, just a few feet away from the door, and they were able to walk straight in. He acknowledged that it was his intent to go into the apartment so they could elaborate on the investigation. His request for consent to search was a request for verbal consent. Later, he asked for written consent after he'd talked to Agent Hooten. After he completed the paperwork for the written consent to search, she asked to call her attorney. Defendant Tracy did not give written consent; she called her attorney's office, and whomever she spoke to said not to consent, so all searching ceased. The officer agreed that nothing about this was in his report. He did not know if Officer Mayo spoke to the attorney, but knew that he did not. Regarding what he found in the apartment, he reiterated that it was a Pringles can and some paperwork. He's not sure it was a utility bill with Claude X's name; it might have been something else. He didn't find anything else, except the a scale, which he agreed could have been used to weigh mail. He's not sure if he had consent before or after they entered the apartment. He doesn't remember the actual reason they entered the apartment. They could have gone in there to get the keys to secure the apartment. They were initially waiting for the person to come collect the keys, but then Agent Hooten came, and they decided to seek a

12

search warrant. When he asked for consent, he doesn't recall what he said exactly. He doesn't remember what he said or what she said. She might have said she didn't know if she had authority to consent to the search. He did not give her advice because he can't, but he thinks he just asked her how long she had been living there. He thought she told him she'd lived there a week, and was not actually on the lease, but that the lease was in Aleha Poe's name. She might have said she was temporarily staying at the apartment. He doesn't recall how she happened to consent to the search.

Officer Zumdome typed the application for the search warrant. He thought he knew that a federal magistrate judge was unavailable, and that they were going to try to have a state court judge sign the warrant. He took the search warrant to the scene. The items found before they got the search warrant are not listed on it, because they were seized pursuant to a consensual search. The items listed on the return are what they seized pursuant to the search with the warrant. He stated that he did not recall exactly where he started the consensual search, and did not remember if he went into rooms other than the kitchen, but he did not do a full search.

The next witness for the government was Mark Hooten, Special Agent for the DEA. On October 9, 2008, he was called by Officer Zumdome to bring a camera to Aarika Tracy's apartment. He was told that they were searching the apartment with her consent, and he participated. They stopped the search when defendant Tracy asked if she could call her attorney. They allowed her to do so, and after that conversation, she advised them that her lawyer wanted them to quit searching, which they did. When he arrived, she was already under arrest. After the other officers left with defendant, he and Officer Arnold stayed at the apartment. They waited while the search warrant was being sought. They called two more DEA officers, who all sat

13

together and watched TV until they got the search warrant. They didn't got into any other room and did not search. While they were waiting, Christina X came to the door. They identified themselves and told her that Ms. Tracy had been arrested. They asked her if defendant Tracy lived there, she said she did, and that she had been there for a few days. Christina X wanted to get some clothes, and they told her to come back the next day after defendant Tracy had been released from jail After that, the supervisor and another officer came. Other than securing the apartment, no one did any police activity until after the warrant was issued.

On cross examination, Agent Hooten testified that he did not recall if they spoke to Ms. Tracy's attorney when she called him. He thinks she was using her phone. He doesn't recall if he had a discussion with Officer Zumdome about getting written consent.

The government next called Justin Arnold, who is a Springfield Police Officer and a deputized DEA agent. He was called on the day in question by Agent Hooten. As he arrived, Ms. Tracy was leaving with the officers. He was securing the apartment while they waited for the search warrant. He learned that Ms. Tracy had been arrested on a federal warrant and that Officer Zumdome was going to seek a federal search warrant. He sat with Agent Hooten and watched TV. He thought they were watching music videos. He was sitting on the couch and did not search anything. The DEA supervisor and another Task Force Officer arrived. Christina X arrived while he was there; he was familiar with her because of his law enforcement duties. After the two other officers came, no one did anything regarding searching the apartment.

At the close of its case, the government argued that there was probable cause for the issuance of the search warrant for defendant Tracy's apartment; that Officer Zumdome was a federally-deputized law enforcement officer who discovered incriminating evidence in her

apartment through a consensual search. This evidence corroborated other information they knew pursuant to their investigation about drug activity. He then sought a search warrant, and when a federal magistrate was unavailable, the warrant was obtained through Federal Rule 41, which allows a state court judge in the district to issue the warrant. It is contended that the affidavit in support of the search warrant contained probable cause, and that the warrant was properly issued. The government contends that the evidence was legally seized, either pursuant to defendant Tracy's valid consent or via a valid search warrant.

Defendant Aarika Tracy testified on her own behalf. She recalls being outside when the officers arrived. She was smoking a cigarette and talking on the phone. It was her testimony that the officers advised her that she was being arrested pursuant to a federal indictment. She stated that she was not placed in handcuffs until after she talked to her attorney and then denied consent for the search. Defendant Tracy testified that she was first placed in a police vehicle when the officers approached her and told her she was under arrest. She was there for about 15 minutes. She sat inside the vehicle while Officer Zumdome was outside the vehicle, on the phone. Then he said they were going to search the apartment, and to take her out of the vehicle. It was her testimony that she was not asked for permission to search. She told them it was not her apartment to give consent, but the officers went ahead and searched anyway. She stated that she did ask for permission to call her attorney because it was not her apartment. It was her testimony that Agent Hooten told her that she had no rights, and even told that to her attorney when he got on the phone with him. Defendant also stated that she refused to sign a consent to search form.

On cross examination, Ms. Tracy admitted that she knew on the date in question that defendant Claude X had already been arrested. That didn't concern her. She denied knowing

whether he paid the rent on the apartment because it was not her apartment. She stated that she was not on the lease, and that the leasee was Aleha Poe. She denied paying the rent. Defendant testified that, not only was it not her apartment, but that she was not staying there. Rather, she was cleaning the apartment because Ms. Poe had taken off and she didn't know where she was. She cleaned it because of her landlord. Defendant Tracy stated that she had referred Poe to the landlord, and that she cleaned the apartment because she didn't want to leave it dirty, which would look bad for her. It was her testimony that it was her money that was found on top of the refrigerator, and her digital scales, which she used to weigh mail. The utility bill that was addressed to her was actually a disconnect phone bill. She stated that she had been helping Ms. Poe get a phone so she could have contact with her mother. Defendant Tracy stated that, although it was not her apartment, her rights were violated because Agent Hooten told her she had no rights.

At the conclusion of her testimony, defendant Tracy reiterated that she denies that she gave consent to search the apartment. It was submitted that Officer Zumdome could give little or no detail about her consent. Additionally, defendant Tracy challenges the evidence found as a result of the search warrant being executed because the officers remained in the apartment while they were securing it. It is her position that it would have been a simple matter to lock the only door and station an officer outside until the search warrant had been obtained. Defendant asserts that there was no consent and additionally, that the officers stayed in the apartment to set a trap for defendant Christina X to further their investigation.

Having fully reviewed the record in this case, including the testimony adduced at the hearing, the Court finds that it must be recommended that defendant Tracy's motion to suppress

evidence seized from her apartment be denied.

As a preliminary matter, the Court notes that, based on defendant Tracy's testimony at the suppression hearing, it could be argued that she lacks standing to challenge the search of the apartment on October 9th, 2008. While not previously argued by the government, Ms. Tracy, on the witness stand, repeatedly stated that she did not live at the apartment, and that she was not even staying there. She testified at length about how she was only at the apartment to clean it. She disavowed any knowledge about defendant Claude X paying the rent, and stated that the apartment was rented by her friend, Ms. Poe. She then testified, however, that her name was on a phone bill in the apartment because she was helping Ms. Poe pay for a phone. She also acknowledged that the cash found in the Pringles can was hers, as well as the digital scales found in the same area as the currency, and that there was mail addressed to her in the apartment.

The Fourth Amendment protects against both unreasonable searches and unreasonable seizures. United States v. Valerie, 424 F.3d 694, 706-09 (8th Cir. 2005). According to the Supreme Court, a Fourth Amendment search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobaea, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The law provides that an individual challenging a search and seizure can establish a sufficient interest to constitute standing "if he has an adequate possessory or proprietary interest in the place or object searched" and if this assertion of a property interest is supported by an expectation of privacy. E.g., See United States v. Kelly, 529 F.2d 1365, 1369 (8th Cir. 1976); United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995), citing United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994). From the facts that were adduced at the hearing in this case, the Court finds that defendant has raised a serious question

regarding whether she had an adequate proprietary and privacy interest in the apartment, sufficient to establish standing.

Assuming, however, that defendant Tracy exaggerated her living arrangements at the apartment, and that she does have standing to challenge the search based on her occupancy, for some period of time, at the apartment, the Court will turn to the issue of her consent to the preliminary search. Based on the credible evidence before it, the Court finds there is no basis to conclude that defendant Tracy did not voluntarily consent to the search of the apartment. To determine whether a statement has been made voluntarily, the Court must examine whether it was gained by threats, violence, or express or implied promises that would suffice to overbear the defendant's will. Simmons v. Bowersox, 235 F.3d 1124, 1132-33 (8th Cir. 2001). The focus should be on the totality of the circumstances, including the characteristics of the accused and the conduct of law enforcement. Id. at 1132-33. The Eighth Circuit has relied on the same type of factors to determine whether a defendant's consent to search is voluntary. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990) Factors relating to the person giving consent include age, general intelligence and education, whether he or she was under the influence of drugs or alcohol, if Miranda rights were read prior to consent, and whether the defendant had experienced prior arrests and is aware of the protections the legal systems affords to the accused. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted). Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently. Id.

Case 6:08-cr-03109-MDH   Document 88   Filed 10/14/09   Page 18 of 21

In this case, it is obvious that defendant Tracy has had more than ample experience with law enforcement. It is further apparent that there is more than some reason to question her credibility, based on her self-serving statements during her testimony. Further, there was nothing adduced at the hearing to surmise that she is not of at least average intelligence, nor was there any suggestion that she was under the influence of any drugs or alcohol that would have impaired her ability to give consent. Additionally, although she was under arrest, she was not handcuffed, was allowed to move about, and was granted permission to use her phone. While there was some dispute regarding whether she was placed in the police vehicle at some point after her arrest, even if she had been, there is nothing about that event to suggest that she was somehow coerced into giving consent. The Court is aware that there was a period of time after her arrest and before Officer Zumdome requested consent, about 30 minutes, which defendant suggests was unduly lengthy. The officer explained, however, that defendant Tracy made her phone call and then they were waiting for an individual to come to the apartment and collect her keys before they took her to the Greene County Jail. Other than defendant's blanket denial that she never gave consent, she does not contend that the time period at the apartment was unduly lengthy, such as to force her into acting against her will. In fact, there was nothing in her testimony to indicate that she was overcome by police coercion, that she was made any promises to induce her to consent, or that she felt the least bit apprehensive, much less under duress. All parties agree that after she called her attorney, she told the officers she wanted to halt the search, and they did so. She also refused to give written consent, which indicates to the Court the voluntariness of her actions, and that her will was in no way overborne by law enforcement. While Officer Zumdome's testimony regarding how he asked for consent to search and what

defendant Tracy said in response was somewhat vague, the Court found his testimony to be credible. Viewing the evidence in a logical manner, it appears consistent that defendant did acquiesce to the initial search, and when the officers found incriminating evidence, she had the wherewithal to call her attorney, halt the search, and refuse to provide written consent. Accordingly, the Court finds that under the totality of the circumstances, defendant Tracy voluntarily consented to the initial search of the apartment.

Her argument regarding the officers' actions in staying at the apartment while the search warrant was obtained appear to be merely conclusory. Based on the officers' credible testimony, the Court finds that bare assertions regarding an ensuing search are without merit.

Finally, while defendant Tracy challenges the manner in which the search warrant was obtained by the services of a state court judge, the Court finds that there was no impropriety nor illegality in that process. Clearly, the United States Attorney's office followed proper procedure when the undersigned was unavailable; the fact that Judge Cordonnier was willing to accommodate the officers by going to their office does not suggest any impropriety; and the fact that the judge inquired about his authority to sign the search warrant is further evidence that there was nothing about the process of obtaining the search warrant that would render it invalid. Further, even if there were any indication that there were some impropriety in obtaining the search warrant, there is no question that the officers were operating in good faith, and that Leon would apply. Accordingly, the Court finds that it must be recommended that defendant Tracy's motion to suppress evidence be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendants Claude X, Christina X, and Aarika Tracy's Motion to Suppress Evidence seized from Safe Deposit Box # 595 be denied; it is further

RECOMMENDED that defendant Tracy's Motion to Suppress evidence seized from her apartment be denied; it is further

ORDERED that defendant Tracy's Motion to Disclose Identities of Confidential Sources is denied.

 /s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate Judge

Date: 10/14/09